The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. And to all of you as well, I hope that you and your families are all well. There may be times when there are technical difficulties. Hopefully there won't be. But if there are, you know, we'll all stay calm and we'll accommodate the lawyers in every way possible. Except none of us are getting off this panel. Okay, so the first case of the day is number 212459, Circle Block Partners, LLC v. Fireman's Fund Insurance Company. And Mr. McGill? No. Yeah. Anytime you're ready. Okay, well, good morning and may it please the represent Circle Block in this case. Circle Block's claims have met the pleading requirements that have been established last week by the Indiana Court of Appeals in the IRT decision and by the parameters set by this Court in the Sandy Point decision in December of 2021. Specifically, what the Indiana Court of Appeals told us in the IRT case last week is they cited the oral surgeon's case also relied upon by this circuit in the Sandy Point decision saying there are pleading requirements and specifically there must be some physicality in the loss or damage of the property. For example, physical alteration, physical contamination, or physical destruction. Our pleadings specifically meet those requirements of IRT. Those same requirements were in its decision. From the time that we pled this case to the present day, we understand that this case is distinct from most all COVID cases that have been pled across the United States. It's distinct in several important ways. Number one, it's distinct because we make very specific allegations about the type of physical damage at this hotel. Second, it's distinct because of the scientific support that we have provided in support of our allegations that is specific to a hotel-type exposure. Third, this case is very different because of the admission by Fireman's Fund in this case that the COVID-19 particles do contaminate surfaces. Furthermore, and also critically, Fireman's Fund and Allianz gave directives to hotel owners that were insured by their company to take certain steps on repair and certain steps on restoration of their properties because of the nature of the exposures in a hotel. Finally, the fourth distinction of this case and why this makes this case so materially different from the other cases that Circle Foot Locks repair and restoration efforts were specific to the problems and the exposures, specifically the direct physical damages that were involved here. So turning to the allegations that we're pointing to to make this case so different, number one, we allege specifically in our complaint that there was physical and continuous presence of the virus in our hotel, and we supported that with specific allegations, time, and type of exposure. Further, we supported that we made allegations in the complaint that there had been physical alteration and contamination of our hotel property and our hotel surfaces. And third, we described the persistent nature of the virus by virtue of our scientific citations and our allegations incorporating those specific scientific circumstances. I worry about the word physical. Physical seems to mean there's some physical damage if there isn't. And you're saying if something gets on the surface, that's enough for a physical challenge. Is that correct? Yes, sir. It is. It is correct. And we allege that in our complaint specifically. What we've indicated specifically, I'll refer, for example, to paragraph 64, Your Honor, where we said specifically in our complaint that these particles physically impact the surfaces, physically contribute to contamination, and have a propensity to attach to surface for long periods of time. And Your Honor, we specifically supported that allegation with scientific references. In particular, I would cite the court to the Mikeskin article that we cited in the record before the court, where in that particular scientific journal, what was confirmed specifically about that type of contamination, what it says in pertinent part relative to the physical impact is the following. Air particles are the primary mode of transportation or transmission for the virus. We understand that. But critically, what that literature says is, the virus is also capable of adhering to the surface and causing infection through that route. It's that science that's a core predicate of our complaint for this hotel in these circumstances for specific reasons. Number one, we invite... Before you do that, how does that, how do those, I'll call them things, how do those things render the property unfit to use or otherwise require replacement? That's why our, this being a hotel and our allegations being specific, it's so critically important to everything we're saying today. We had to take special steps because we have draperies containing, potentially containing the virus. We have carpeting. We have hard surfaces like desktops. We have linens. And we have also prolonged exposures to our guests. In other words, we are not a restaurant. We are not a coffee shop. People are sleeping in beds with our textiles on them. They're sleeping in rooms with our carpeting, and they're working at the desktops in our hotel rooms. And are they doing that today? Well, I can tell you in most places I stay, what's happening is exactly what Fireman's Fund directed, that is decommissioned the rooms. What they told us to do at the Conrad Hotel in Indianapolis is, if you have somebody with COVID in your building, it's a crisis. They told us that you have to do quarantine protocols. And they said specifically, decommission the room in question if you have a person with the virus. And they told us to leave the room in question for 24 to 72 hours. I think what the court can see, based on the briefing, that's what's been happening across the United States as to hotels. Okay? And it's the science that we've referenced, that Mike's referenced, that is there that we think is very important. One final thing, and Judge Mannion, I believe this addresses in part your question. When we look specifically at what type of cleaning and whether cleaning can be effective, we've cited four different types of scientific literature that is specific to our hotel environment and our judgments. We've cited literature from- that is so substantial as to constitute a physical dispossession. Is that what you're saying? We're saying that, specifically, these COVID particles, Your Honor, cause physical damage to the textiles and the surfaces in our hotel rooms to make them- But is it a physical dispossession? I think there's some difference. Yes, it is. And this brings us to the Purdue brief that has been filed, which has identified these specific circumstances of why, one, the virus is persistent over time, and two, why it has a specific physical impact. And if I could, I will cite the court, not only to our allegations in the complaint, which is paragraph 67 and 68, but also to tell you to describe to the court- I'll go back to the Mike Skinn article that confirms why this type of particle deposit on these products, on these different surfaces and textiles, is a problem. And furthermore, with respect to- Okay. I want to just interrupt. Is that problem damage or is it a problem of loss of use? It's damage. It is direct physical damage that's been caused to the hotel property itself, and specifically the rooms that are involved where guests would stay. With respect to- Mr. Joe, could I follow up on that in your reference to the Purdue brief? I understand that scientists describe the way different substances attach to one another when one is on a surface. Are you prepared to offer scientific evidence that someone can tell whether a COVID virus was present, let's say, a month earlier on a particular physical surface that it was damaged in such a way that you can detect it long after the virus has decomposed? We are, and I think that the Purdue brief shows that, Your Honor, in terms of what we have submitted in terms of the scientific evidence and the scientific basis for that. And furthermore, if I could add one last thing on this- Can you be more specific, though, about which evidence cited in the Purdue brief supports that notion that there's some long-lasting, detectable physical effect on the surfaces? Yes, in terms of the long-lasting effect, give me one moment. I'm referring to the American Journal of Respiratory and Critical Care medicine literature, and this is cited by Purdue at page 14. The virus can survive for nearly a month at room temperature on a variety of surfaces, including glass, steel, vinyl, plastic. Okay, so suppose it's two months. The virus has broken up. Can scientists detect an effect two months later on those surfaces? I'm not absolutely sure about the detection, but I know there's continuous exposure, or I should say continuous deposit of the virus from people coming in and out of the hotel. And so when we look at the answer to your question, I don't think this is a static environment. I think that we have a situation specifically where there is a continuous deposit of the virus. And I would point out two things there in terms of the allegations of our complaint and the interrogatories that are properly before the court. We've shown over a year of particular people who had particular types of people from athletes to the valet that had the virus and were in the hotel itself. I see my time is nearly up, so if I may... I hope we might not stick too tightly to the time limits in this case. We will not stick too tightly to the time limits. Given its challenges. Mr. McGill, you've asked that we certify this question to the Indiana Supreme Court. The decision of the Indiana Court of Appeals in the IRT case provides appellate guidance from Indiana courts that obviously was not present when you all your scientific articles referenced. But I'm wondering on the legal issue more broadly, that is, it's been debated on what direct physical loss or damage means around the country. What is there, if anything, special about Indiana insurance law that should lead us to either certify or perhaps just wait and see what the Indiana Supreme Court does with the IRT case? Two points. One, I think it's a critical question for obvious reasons. We believe that the guidance from IRT is sufficiently specific to resolve this case today, especially if we look back at what the insurance policy says specifically and what this in December and the Court of Appeals decision last week is sufficient detail to make resolution. The only thing I would add to that, Your Honor, is this. When you get to the point of physical contamination, of course, there could be further definition of what physical contamination or physical alteration. You could have more definitive guidance from the Indiana Supreme Court on each definition. However, under the logic of the science that we think we've presented to our allegations and the science that we see in the Purdue brief, we don't think further elaboration is necessary to determine under these allegations on a motion to dismiss standard whether or not there has been a physical alteration or contamination. It's sufficient, in our view, to allow this to proceed, reverse the dismissal, and allow this proceed with evidence to be produced. Because I think there is, things have changed quite a bit in the last week. And on December 9th, when we had the opportunity to review the logic of the standing point decision. So, I hope that's a good answer to the question, an appropriate answer to the question. Thank you. Thank you. Okay. Thank you very much. Mr. Solberg. Good morning, your honors, and thank you. May it please the court, Brett Solberg for Fireman's Fund Insurance Company. Your honors, the federal courthouse today in Chicago isn't closed to avoid direct physical loss or damage. We're not doing this via Zoom to avoid direct physical loss or damage through COVID contamination to the federal courthouse. We're doing it to avoid harming human beings and transmitting the virus to one another. The virus doesn't do, as this court said in Sandy Point, the virus doesn't do anything to property that physically harms it so that it would require repair, rebuilding, or replacement. And we agree, your honor, that Sandy Point and IRT control the outcome of this case. We disagree on what that outcome is. But if you compare the allegations and the issues addressed in IRT and in Sandy Point, you will find that they are virtually identical to CircleBlock's allegations and its theory of the case more generally. For example, the policy language in both IRT and Sandy Point was materially identical, direct physical loss or damage. The Sandy Point, the Bend Hotel, which was one of the plaintiffs in the Sandy Point decision, as well as the Indiana Repertory Theater, both alleged the physical presence of the virus. And indeed in IRT, there was a subsequent summary judgment ruling in which the court considered all of the evidence that Mr. McGill is explaining today and determined that no one could actually contend that property suffers physical alteration or damage annually when flu season arrives. And the court found that there was no dispute that the virus dies on its own. And indeed, the Purdue brief says that the virus dies on its own. And if the virus dies on its own, it doesn't materially impact the structure. For argument's sake, for argument's sake, if we find that the virus remains on surfaces to the point where it requires the replacement or remediation of the ventilation system in order to be safe for people to use, would that fall within the policy? Dr. Gregory Poland Likely not, Your Honor. It depends on the nature of the harm. So the classic example of a covered claim in this instance would be Legionella. So the bacteria that causes Legionnaire's disease, that is very, very difficult to clean and requires extensive remediation, ripping out the systems, et cetera. But that grows in the air conditioning system itself. The virus in this case doesn't do anything to the air conditioning system. It doesn't do anything to the hotel in terms of a physical alteration to those structures. Dr. Anneke Vandenbroek We know that definitively. Dr. Gregory Poland Of course, you mentioned Legionnaire's disease, and I'm thinking of the Bellevue-Stratford in Philadelphia. Dr. Gregory Poland Precisely. That was the sort of the seminal epidemiological example of Legionella. But Your Honor, we know it sufficiently to answer the question of this issue that's before the court, which is one primarily not of science, but of contractual interpretation. So what Purdue says is two things. Purdue says first, the COVID virus may be harder to clean than we thought it was. Okay, that's number one. The other thing is it may live a little bit longer than we thought it would, although there's no indication that fomalheit transmission is a vector in this way, and the CDC has said that. And I believe the court can take judicial notice of the CDC's decisions on the science on this. But even if you take as true... No, Your Honor, absolutely not. That is not our position. What we're saying is, if you take Purdue's brief as true, just accept what they've said, forget the fact that it's not in the pleadings, forget the fact that it's new information introduced in this proceeding, you still don't have sufficient allegations to make a claim under the property policy, because the virus dies on its own, it can be cleaned, and no one says that, for example, a muddy boot print on the Conrad's entryway is somehow direct physical loss or damage. And no one before COVID would have ever claimed that even though flu kills many people every year and is very infectious and can be transmitted via fomites, that someone sneezing in the Conrad either damaged the curtains or caused a direct physical loss such that the Conrad was unusable. And we know, Your Honor, the Conrad is not unusable because it is being used. That's the best evidence. When you asked Mr. McGill that question, and he didn't really answer you, it is in use. It was only shut down because of economic reasons. It was never required to be shut down by the governor. In fact, the governor's order said it was a business that was allowed to stay open as essential. And they made the economic, and we don't question the wisdom of that decision from an economic perspective, but the only reason it closed down at all was because they were losing more money keeping it open, which is fair. But it has since been reopened and is since in use. And so even if by the way, it has not done, and that standard, which was properly cited by the Sandy Point Court, by this court in Sandy Point, as an Illinois concept of law exists in only a minority of states. But setting that aside, it isn't applicable here. But what we also know from Purdue is there's no allegation, excepting as true Purdue's statements, there's no allegation here that any property needed to be repaired, rebuilt, or replaced, which is critical, as this court said in Sandy Point, and as the IRT court mentioned, to understanding whether or not there's an actual claim here. You see... Yes, sir. Robert, I want to ask you about a different topic here. And that is the policy here has a provision for communicable disease coverage, correct? Yes, your honor. And you're telling us that this also has an exclusion for viruses and bacteria, correct? That's correct, your honor. So, can you describe for me a claim that would satisfy communicable disease without running into your virus and bacteria exclusion? Yes, your honor. Any claim that meets the condition required to trigger communicable disease coverage, which is a communicable disease event, would not be barred by the virus exclusion. The way that Fireman's Fund reads the that that extension is not covered by the virus exclusion. How do you figure that? How does a policy owner figure that out from the text? I will concede, your honor, it's challenging. We take the position that it is a... What does that mean? That sounds pretty ingenious, but it sure looks like you've got a problem with your communicable disease coverage being a loser. Yes, your honor. It may appear that way. That's not the way that... It's not the way that Fireman's Fund has interpreted it in practice. It is always covered a communicable disease event in the event that it is covered or the event that it actually occurs. So what does the virus exclusion do? The virus exclusion excludes other forms of direct physical loss or damage that arise from viruses. Now, there are very few types of direct physical loss that viruses can likely cause, as we've seen in all of these COVID cases. The main one is if you had plants or animals that were susceptible to being killed by viruses or sickened by viruses that would be covered under property policies, chattel property, that would be excluded. That would be excluded, but human beings wouldn't? I'm sorry, your honor? I'm trying to say the hotel is not talking about animals. That's correct. You know, we're talking about damage or loss to the property, physical loss or damage or some sort of alteration that requires repair. That's correct. And they have not made that showing and they cannot make that showing. If somebody brings their dog with them, which some people do, that may be a problem. I don't know. But that's not before. That's correct, your honor. But that is where the virus exclusion may come in, in a typical case. I mean, it only, the exclusion really only applies if you can first establish, as Judge Manning, you correctly state that there's coverage in the first instance. Mr. Silberg, one question that I had has to do with the relationships among Allianz and Fireman's Fund. In your brief, you seem to be trying to distance yourself from Allianz and the website that is referred to in Plaintiff's Materials, an argument. And I look at the cover of the policy for Circle Black, Black Partners, the cover letter says, it's on Allianz paper, stationery, issuing company is Fireman's Fund Insurance Company and Allianz Company. Best regards from the President and CEO of Allianz Global Corporate and Specialty North America. What am I supposed to make of this? So your honor, the Allianz referenced in Plaintiff's Materials is a, how should I put it, a cousin, a foreign cousin of the Allianz that is the United States that owns Fireman's Fund. And it is in no way affiliated or in no way directly affiliated with Fireman's Fund. So Fireman's Fund. What does that mean? A cousin, but not directly affiliated? Common ownership worldwide? Eventually in the European, the SE company, all of the Allianz eventually share common ownership. So it's another subsidiary? It is a subsidiary in a separate line, a completely separate line of business from the U.S. subsidiaries that issue this policy. So why shouldn't we allow plaintiffs to use this material? We have not taken the position that plaintiffs can't use this material. We've simply pointed out to the court that it's not Fireman's Fund. What conclusion do you want us to draw from your attempt to distance yourself? Well, your honor, Mr. McGill says that Fireman's Fund has instructed CircleBlock to do certain things. That is not true. If they were amended to say a sister or first or second cousin subsidiary has done so, that would be accurate. It would not, your honor. What would be accurate is that they found a website during the course of this litigation that stated certain things about what COVID does and certain suggestions to remediate it from a company that sells travel insurance, not from a company that sells property insurance. Can I ask you a couple of questions related to the body of legal authorities that are relevant in this COVID litigation? And I'd like you to basically give us your best shot at distinguishing under the rubric of direct physical loss or damage, the gasoline vapors, the asbestos and the falling rock and the mold spore cases. Yes, your honor. The Sandy Point case did it precisely as we believe it should be in that all of those cases either involved either, first of all, they all involved either a substance on the property that rendered it uninhabitable or in the instance of the falling rocks cases or the- if it's a substance that renders it uninhabitable, that sure sounds a lot like virus particles. Virus particles under certain circumstances, your honor, may render a facility uninhabitable. We know that COVID doesn't do that because- yes, your honor, I didn't mean to interrupt you. No, no, I'm listening. Okay. We know that COVID doesn't do that. We know that COVID doesn't cause physical alteration to property and we know that it simply, it doesn't render it uninhabitable. We know that from common experience. Can something be uninhabitable if people are in terror of their lives if they enter that area? Your honor, the standard for uninhabitability is fairly poorly developed around the country. There, like I said before, there are only a few states that recognize that as an alternative to complete destruction or permanent deprivation. It's a proxy for complete destruction or permanent deprivation. And there's only been a handful of these cases, all of which I think are probably cited by CircleBlock. The Third Circuit's case involving the asbestos is probably the best, most robustly developed example of this case law from around the country. And even that is, it leaves one with a lot of poorly developed. We would concur with that. And it's difficult to tell, which is why many of these states have not adopted it. It's because it's very, very difficult to tell what constitutes complete and total permanent uninhabitability, which is what the standard is in all of these is a generalist judge faced with a difficult insurance problem. The name that first comes to mind is Couch, along with Appleton. And I turn to those, I urge my clerks to help me understand what guidance they provide. And here we've got Couch sounding very much like an advocate. You've seen the critique in one of the amicus briefs here on the passages that are very favorable to the insurance industry in these cases. But at least it looks to me like push hard enough. And you see that Couch recognizes a split authority, split of authority on coverage when it is physically dangerous to inhabit or use structure and insured structure. So Couch, what Couch says, and I've read the critique of Couch, which by the way, was written by plaintiff's lawyers who have cases against fireman's fund. So that's as interested of an author as you can possibly imagine, who has direct financial interest in the outcome. Couch, unlike those authors, is neutral. And these, so their critique of Couch is that Couch gives short shrift really, I mean, if you really look at it, gives short shrift to this notion of the trend towards permanent uninhabitability being a direct physical loss. And that Couch seems to focus on the fact that complete destruction is necessary to have a direct physical loss. I would say that all one has to do is read Couch, and you'll find Judge Hamilton exactly as you said, that Couch acknowledges that the doctrine that the court explained in Sandy Point is alive and well, although it is a minority view. And so, you know, what Couch is doing is just like any other, like Schoenbaum on Admiralty, you know, they're trying to amalgamate, almost restate the law. And I think what Couch does is completely accurate, because the physical alteration test that Couch cites, and the fact that intangible losses are not direct physical loss or damage, is the law in virtually every state. There are only a handful of states like Illinois, and that happens to be a neighbor in Indiana, but it doesn't make the law the same necessarily on this point. It doesn't, it does not represent the majority view. Thank you. Thank you, Your Honors. Thank you. Mr. McGill, you had asked for five minutes, and that's what you'll get. Thank you, Your Honor. And let me turn first to just bringing back the focus of the context, what we regard as an extremely limited context of a hotel operating, having business invitees into our hotel, in circumstances where our invitees have a prolonged exposure to every property in our business. And we recognize that at the Conrad Hotel, that's what we pled from the beginning of this case, before some of this authority came down, and before a lot of lawsuits were filed. As a part of that, we'll just go back to one fundamental point. When the risk bulletin came out from Allianz, and as Judge Hamilton pointed out, the transmittal front of our insurance policy came from the CEO of Allianz, specifically describing himself as the CEO of Allianz Global Corporate and Specialty. Well, the risk bulletin from Allianz Global Corporate and Specialty was specific to hotels. Okay. And so, they understood we were different. They understood that specific risk abatement circumstances needed to take place. Fast forward, if we could, for a moment, or switch to Purdue. Purdue, at pages 22 of its brief, talks about how the material alteration of the property in our hotel occurs. The virus adsorbs into the surface of inanimate objects, making the surface of the object fundamentally, materially different, rendering the surface dangerous. And we're talking about hotel surfaces, textiles, hard surfaces, desktops, linens, everything that we brought hotels into. I'm sorry, our hotel guests into. We look at the risk bulletin. If somebody died from an exposure inside a hotel, I'm guessing we'd see this risk bulletin and personal injury litigation that would ensue. So, with respect to going back to Purdue for a moment, the virus affects the material dimensions of surfaces, again, referring to our surfaces in the hotel. So, what does that mean as we take one further scientific step in the specific context of our hotel? That brings us to the Mikeskin article, which says what we all know, the science is evolving, but we know from what we've cited, air particles are the primary mode of transmission for the virus. Understood. But this scientific literature then gets to the point that we all have to be concerned about for purposes of the analysis here. But the virus is also capable of adhering to surfaces and causing infection through that route. It's causing infection through that route that had to be dealt with. Period of restoration. We had to do everything we could to disinfect our surfaces, to disinfect our property. We did so, and we made allegations in our complaint that we took extensive restoration and repair activities. What we did was we disinfected frequently and repeatedly, and we tested, we monitored, and assessed the presence of the COVID particles. Those are the allegations of our complaint. That's what we said more than a year ago. So, Mr. McGill, are you asking us, in essence, to issue an opinion that is specific to Indiana hotels? Yes, on the Indiana hotels for this reason, because we think our specific location means something for interpretation. Yeah, I mean, in terms of Indiana law. Yeah, exactly. So, we're on the same page then. The answer is yes, for the reasons of the limitations of our particular claim. Hotel prolonged exposure in circumstances where grave personal injuries are at risk. And furthermore, last point on what the folks said here, call it a directive. We're not going to call it a mandate, but this risk bulletin that we've been referring to had a lot of features to it. And any reasonable person would listen carefully to what was written or would consider carefully what was written here. What's written in their risk bulletin is to decommission the rooms in question, to leave the room vacant for 24 to 72 hours. I don't know who on the panel has been in a hotel, but that's the reality in the United States today. That's our reality at the Conrad, and that's what we allege. So, with respect to these limitations, we think, and we said this from the beginning, and we say it again this morning, this is a very limited set of circumstances here. We are not a restaurant. We are not a coffee shop. We're not a commercial building. We're hosting people for a long period of time, overnight at a minimum, in our hotel. And it calls for specific circumstances and to be cognizant of whether those particles had adsorbed into our properties. Thank you very much for the time this morning. Thank you both very much for your argument this morning. And the case will be taken under advisement. Take care of yourselves. Thank you. Thank you, Your Honors.